## THE HATTIE THOMAS.

### THE DOWNER NO. 14.

#### No. 10611.

District Court, E. D. New York.
March 13, 1930.

Foley & Martin, of New York City, for libelant.

Alexander, Ash & Jones, of New York City, for claimant.

BYERS, District Judge.

The facts in this cause are not obscure: On August 26, 1926, during the afternoon, the libelant's steam lighter Hattie Thomas, 90 feet long, had made fast a line from her starboard side to a barge lying on the north side of Pier 54 in the North River, close to the bulkhead of the slip between Piers 54 and 56. The Hattie Thomas, therefore, was headed east, and was lying practically parallel to Pier 54 at the inshore end of the slip, about twenty feet from the pier.

The slip is 300 feet wide. On the south side of Pier 56, the steamship Lancaster was berthed, headed inshore. At her forward hatch on the starboard side, there were two barges, placed there by the tug Downer No. 14, which was on the starboard side of these latter vessels, immediately prior to the collision which is the subject of this litigation. The beam of the Lancaster is said to be about forty to fifty feet; and, about amidships on her starboard side, was a coal barge and a "hoist," each about twenty feet wide.

The position of the latter may have been a trifle aft of amidships of the Lancaster. There were barges lying on the north side of Pier 54, with intervals separating some of them, measured lengthwise of that pier.

In these circumstances, it will be seen that, for a considerable portion of the slip, the lateral area of maneuver was reduced from 300 feet to approximately 200 feet.

The Downer No. 14, desiring to leave the slip, reversed her engines and made sternway in a starboard arc which brought her stern to within 90 feet of Pier 54 about midway between the end of the pier and the bulkhead, and in an open space between barges lying on the north side of that pier. The tug then proceeded under a starboard wheel, across the slip. There was not sufficient room to accomplish the completion of this maneuver so as to enable the tug to avoid contact with the coal hoist alongside the Lancaster, but the tug fetched gently against the hoist, i. e., her starboard bow was in contact. In this position, the stern of the tug projected into the slip in the general direction of the position of the Thomas, above referred to.

The tug reversed her engines and gained sternway, preparatory to completing the turn which would enable her to head out of the slip. She had no lookout astern.

While this was going on, the Thomas had begun also to back out, intending to turn, so as to make fast her port side to one of the barges lying alongside of Pier 54. She gathered sternway, but also had no lookout at her stern.

The testimony is in conflict as to what immediately took place. The testimony for the tug is to the effect that, while her engines were in reverse for a brief period of time, the vessel itself was standing still at or immediately prior to the impact next referred to; the testimony for the lighter is that the captain, being in the wheelhouse and having a clear view astern and observing the tug in the head to Lancaster position which has been described, ordered his deck hand to cast loose, and put his engines into reverse, intending to back in an arc to his port side, which would bring him near one of the barges lying on the starboard side of the Lancaster but east of the position occupied by the tug, which this witness assumed was not in the act of changing its position at that instant of time.

The lighter's captain says that he backed his boat about two lengths when he observed

the tug making sternway, which, if continued, would bring the tug into contact with the lighter; he thereupon put his engines ahead and blew an alarm signal; the engines of the lighter, being in the ahead position, did not at once overcome the sternway on the vessel, but the captain believes and testifies that, before the impact occurred, the lighter had stopped making sternway, and was actually moving a little ahead.

It will be seen therefore that, according to these respective versions, the tug was at rest, and the lighter starting ahead, which is another way of saying that the boats never came into contact; but the evidence is that the collision occurred, which means either (a) that the sternway of the tug was greater than the headway of the lighter, if there was headway on the lighter, or (b) that the sternway on the lighter was never checked and her stern came into contact with the stern of the tug while the latter was not in motion.

The task of deciding which is the more probable happening can be resolved only in the light of the physical facts, which were that the stern of the lighter was damaged, while the tug suffered no injury, and this would seem to point to the conclusion that the greater force was delivered by the tug. As has been said, the sterns of the two vessels came into collision, and that of the tug, protected by a fender, being higher than that of the lighter, rode over the stern of the latter, and the damage claimed by the lighter resulted.

The tug asserts that the contact was very gentle and not nearly sufficient to cause the damage alleged, and disclosed in the survey.

The contention on which claimant lays most stress is the aged and infirm condition of the structure of the Thomas, as shown by her impaired rim-log, and the fact that the rudder stock was bent. This is met by proof that the rim-log, although decayed on the top surface and for practically seven feet of its length at the round of the stern, was sufficiently stout, ten months before the collision, to be capable then of accepting one or more bolts fastening stout log rails to the rim-log. Certainly, nothing is shown in this proof which establishes unseaworthiness on the part of the Thomas.

Considering, however, the restricted area in which backing or sternway movements were to be conducted, it seems that the requirement for maintaining a lookout on the stern of the Thomas, from the time she started on a course which would inevitably incline her to her port side and in the general direction of the Downer as observed by the captain of the Thomas before he started his sternway progress, is one that was not met, and which cannot be said to have been so unimportant as to have failed to contribute to the collision.

For this reason, the damages should be equally divided, and a decree may be taken by the libelant for costs and one-half damages.